16 P.3d 900

**Deborah STEVENS, Plaintiff–Respondent,**

v.

**Larry STEVENS, Defendant–Appellant.**

No. 25662.

Supreme Court of Idaho, Rexburg, September 2000 Term.

Dec. 15, 2000.

Anderson, Nelson, Hall, Smith, P.A., Idaho Falls, for appellant. Scott R. Hall argued.

Weinpel, Woolf & Combo, Idaho Falls, for respondent. Marc J. Weinpel argued.

KIDWELL, Justice.

Larry Stevens appeals from the magistrate judge's order in a divorce proceeding against Deborah Stevens. The magistrate judge held that an oral settlement agreement between Larry and Deborah was unenforceable because it was not written, pursuant to I.C. § 32–917. The magistrate judge's order was affirmed by the district court acting in its appellate capacity.

## I.

## FACTS AND PROCEDURAL HISTORY

Larry and Deborah were married on August 17, 1973 in Bonita, California. Larry was in the military at the time. Their two children were born in 1981 and 1982. Larry retired after serving twenty years in the military and subsequently worked for Pillsbury and Lockheed Martin. Deborah, who had two years of college in the early 1970s, suffered from various ailments including progressive myopia, flat feet, and debilitating headaches; she did not work outside the home. By 1988, Larry and Deborah lived in Idaho.

In February 1998, Deborah filed for divorce, citing irreconcilable differences. She asked for spousal support and proposed a property division in her complaint. In early May 1998, Larry answered and requested judgment on the pleadings. He agreed that the couple had irreconcilable differences, but alleged that he and Deborah had entered into an agreement covering all issues of property division, child support, and spousal support. On May 18, Larry moved for summary judgment based on his oral agreement with Deborah. He supported the motion with affidavits from himself and Joel Tingey, the attorney representing him at the settlement conference.

In their affidavits, Larry and Tingey averred the following. They had met with Deborah and her then-attorney, Royce Lee, on April 17, 1998 for a settlement conference. After approximately two hours of discussion, they reached a final agreement resolving all property and support issues. Lee dictated the terms of the agreement into a tape recorder so the agreement could be committed to paper. The dictated agreement constituted the entire agreement and the only work left to do was the clerical work of committing it to paper.

Larry and his attorney provided identical accounts of the agreement. Deborah was to receive the house and its furnishings and "the Prudential funds." She would receive $900 a month in child support, dropping to $600 a month once the older child reached 18. For spousal support, Deborah would receive 45% of Larry's military retirement and $300 a month in spousal support for two years, with an ability to seek a continuation of spousal support subject to several conditions.

On May 8, Tingey faxed Lee, wanting to know if he objected to Tingey meeting with Deborah without Lee present "to discuss the issues." Lee faxed back an objection to the proposed meeting. On the same day, Lee sent Deborah a draft of the discussed settlement, writing, "We need to do a thorough review on the property settlement issues so that we are certain about the values and balances on the settlement."

On May 19, Prudential processed Larry's request for a $7,000 withdrawal out of the $24,000 cash value of the Prudential life insurance policy assigned to Deborah in the settlement conference.

At a hearing on May 20, Larry asked the magistrate court to enter judgment on the pleadings and issue a final decree. Through her new attorney, Marc Weinpel, Deborah objected to Larry's motion and moved to amend her complaint to include adultery and extreme cruelty as grounds for divorce. The magistrate judge granted Deborah's motion to amend and denied Larry's request for a divorce decree.

In an affidavit in opposition to summary judgment filed on June 16, Deborah disagreed that the parties had resolved all issues. She agreed that Larry's affidavit showed the

general outlines of an agreement, but she stated that she never received the verification of the actual values of the various items of property necessary for the agreement to become final. Deborah stated that Larry had misstated the value of several assets and debts during the settlement conference. She noted that both attorneys contacted her after the conference to discuss the proposed settlement. Deborah also stated that the child support figures reached at the settlement meeting did not conform to the Idaho child support guidelines.

The magistrate judge denied summary judgment on June 18, 1998. On October 13, 1998, the magistrate judge held a court trial on the issue of whether there was an agreement between the parties reached on April 17.

At trial, Larry testified that since the settlement meeting he had complied with the agreement reached on that day. On cross-examination, he testified that he had not provided documents to verify the value of various items at the settlement conference. He testified that he had withdrawn $7,000 from the Prudential life insurance policy to pay for attorney fees, medical insurance for the children, and a vacation.

Tingey testified that at the settlement meeting, he listed the assets and debts going to each spouse in columns on a chalkboard and that Deborah's attorney, Lee, made a final offer, which he and Larry accepted. Eventually Tingey sent a letter asking Lee to save the tape of the dictated agreement, but Lee indicated that the tape was erased in the normal course of doing dictation. Tingey opined that Larry's withdrawal of $7,000 from the Prudential policy did not breach the settlement agreement because Larry was "running out of money" and invaded the account in response to Deborah's refusal to honor the April agreement. Tingey "assumed" that Deborah had access to the financial records. He did not remember Lee making the agreement contingent on verifying the values set on the chalkboard. Tingey also stated that he sought the May 8 meeting with Deborah "to find out where she stood on the agreement" because he had heard that Deborah had fired Lee.

At trial, Deborah testified that she disputed some of Larry's valuations at the settlement meeting but that Lee had seemed "to accept most of the things that they were saying." She reiterated that she never saw any paperwork at or before the meeting which confirmed the value of any asset or debt. She claimed that she was "heavily doped up" on muscle relaxants and tranquilizers at the meeting. She vacillated between testifying that Lee agreed to things and that there was no agreement between the parties. After the meeting, she said, she told Lee to stop working on the paperwork because she was unhappy with the proposed agreement called Marc Weinpel (her current attorney) to begin the process of changing counsel, and started actively investigating the values of the assets and debts discussed at the meeting. When specifically asked if she accepted the agreement on April 17, she replied, "I really didn't say any way or another. Larry said something about, 'Is there anything else blocking us from getting this decree, and, you know, holding up the decree?' And I think I said that I couldn't think of anything."

The magistrate judge issued Findings of Fact and Conclusions of Law from the bench. It found that there was an agreement on April 17, because both counsel accepted the agreement and Deborah, who was present, did not protest when Lee was accepting the agreement. The magistrate judge concluded that there was no fraud, duress, or undue influence, and that the Statute of Frauds did not apply. It also indicated that it believed that the spouses should be free to reach their own settlements, even if this resulted in an unequal division of community property, and that it did not believe that the agreement was unfair. The judge ordered Larry's attorney to prepare a proposed order for a divorce decree incorporating the terms of the April 17, agreement as set forth in Larry's affidavit.

On October 16, the magistrate judge, *sua sponte*, reopened the matter for additional evidence and argument on the enforceability of the oral settlement agreement.

On December 3, 1998, the magistrate judge issued a memorandum decision and order concluding that Idaho Code § 32–917 prohibited enforcement of the spouses' oral agreement.

After the magistrate judge issued a Rule 54(b) certificate, the district court granted Larry permission to appeal. Subsequently, over Larry's objection, the district court allowed Deborah to augment the record with the affidavit of Royce Lee. After a hearing, the district court issued an appellate decision and order affirming the magistrate judge's decision. Because it ruled that the agreement was unenforceable, the district court did not address Larry's issue of whether the appellate record could be augmented by the Lee affidavit.

## II.

### STANDARD OF REVIEW

 This Court reviews the decisions of a magistrate division independently, with due regard for the decision of a district court acting in its appellate capacity. *Keller v. Keller*, 130 Idaho 661, 663, 946 P.2d 623, 625 (1997). The Court upholds a magistrate judge's findings of fact if they are supported by substantial and competent evidence, but exercises free review over questions of law. *Id.* The Court is free to draw its own conclusions from the facts presented. *Id.*

## III.

### ANALYSIS

A. **Idaho Code § 32–917 Requires That Divorce Settlement Agreements Be In Writing.**

The magistrate judge made a factual finding that Larry and Deborah had reached an agreement on April 17, 1998. However, the magistrate held that the agreement was unenforceable because it was not in writing and not acknowledged, and so did not conform to the requirements of I.C. § 32–917. Larry asserts that settlement agreements made in contemplation of divorce are not "marriage settlement agreements" and thus are not covered by the requirements of I.C. § 32–917.

Section 32–917 of the Idaho Code provides:

> All contracts for marriage settlements must be in writing, and executed and acknowledged or proved in like manner as conveyances of land are required to be executed and acknowledged or proved.

Section 32–917 is one of six sections in Chapter 9 of Title 32 (which governs the separate and community property of spouses) that mentions marriage settlements.[1] The other relevant provision is I.C. § 32–916, which provides:

> The property rights of husband and wife are governed by this chapter [Chapter 9], unless there is a marriage settlement agreement entered into during marriage containing stipulations contrary thereto.

1. **Definition of "Marriage Settlement Agreement."**

 Black's Law Dictionary, Sixth Edition, defines a marriage settlement as: "[a]n agreement in contemplation of marriage in which each party agrees to release or modify property rights which would otherwise arise from the marriage." Although the primary definition relates to a prenuptial agreement, Black's suggests that a postnuptial agreement would also be a marriage settlement. A rather confining definition of a marriage settlement is used by W.J. Brockelbank in his treatise on Idaho community property law. Dr. Brockelbank wrote:

> While the term "marriage settlement" may here include a contract that is in fact made after the marriage is concluded, it would seem proper to say that it is probably confined to those postnuptial contracts

---

1. Section 32–918 requires recording of marriage contracts in each county where real estate is located, when real estate is part of the contract. Section 32–919 provides that the effect of recording is akin to the effect of recording or non recording of a real property conveyance. Section 32–920 provides that a minor capable of contracting marriage may make a valid marriage settlement. Section 32–905, passed in 1903 along with a provision governing the management of wife's separate property, provides that the new statute would not invalidate or alter existing or future marriage settlements. I.C. §§ 32–903 to –905.

which purport to change antenuptial contracts or which, at least, attempt to regulate property relations of the spouses as a going marital concern. It does not include separation agreements or any sort of agreement which attempts to liquidate the property relations of spouses about to separate or already separated.

W.J. BROCKELBANK, THE COMMUNITY PROPERTY LAW OF IDAHO 82 (1962).

Idaho appellate courts, however, have repeatedly used the term "marriage settlement" to refer not only to prenuptial agreements, but also to agreements made with an eye towards separation and/or divorce.

In a 1924 case, the husband and wife entered into "a written agreement called a marriage settlement, by which they purported to divide the community property." *Hay v. Hay*, 40 Idaho 159, 165, 232 P. 895, 896 (1924). In this agreement, the husband received certain real estate and the wife received real estate, an automobile, and $9,000. The agreement contained a provision awarding custody of the couple's child to the husband in case of divorce. *Id.* "Each party agreed that the share of property received by him or her should be in full satisfaction of all rights in the community property, and defendant agreed to release plaintiff from all future claims for support and maintenance. It was further agreed that this contract should be incorporated into any decree of divorce.. . ." *Id.* Within a few months of the marriage settlement, the husband filed for a divorce. *Id.* The Court later referred to the agreement as "the property settlement." *Id.* at 169, 232 P. at 897. Although (as Larry argues) *Hay* did not involve the application of I.C. § 32–917, it clearly treated an agreement in contemplation of divorce as a marriage settlement.

Likewise, in 1959 this Court referred to a settlement agreement made in contemplation of divorce as a "marriage settlement contract." *See McRoberts v. McRoberts*, 80 Idaho 511, 513, 514, 335 P.2d 342, 343 (1959). The Court recited the provisions of "a written marriage settlement contract included in

the decree and made a part thereof." *Id.* at 513, 335 P.2d at 343. It again noted that "the marriage settlement contract . . . was incorporated into the decree." *Id.* at 514, 335 P.2d at 344.

In a 1966 case, a husband and wife entered into a "marriage settlement agreement" in April 1945, which divided the community property and made provisions for the wife's support and maintenance. *Turner v. Turner*, 90 Idaho 308, 310, 410 P.2d 648, 649 (1966). They divorced in June 1945. *Id.* at 309, 410 P.2d at 648.

This same understanding of "marriage settlement" is found in a recent case, *Quiring v. Quiring*, 130 Idaho 560, 944 P.2d 695 (1997). The issue in *Quiring* was whether an agreement and quitclaim deed entered into by a couple in contemplation of divorce was valid and enforceable. *Id.* at 561, 944 P.2d at 696. The Court found the couple's agreement unenforceable on public policy grounds. *Id.* at 568, 944 P.2d at 703. In discussing a court's duty to raise the issue of a contract's illegality *sua sponte*, this Court approvingly noted that the trial court had discussed "whether contracts between spouses in contemplation of divorce are illegal" and had concluded that they were not because I.C. § 32–916 and § 32–917 allowed "marriage settlement agreements." *Id.* at 567, 944 P.2d at 702. *See also Badell v. Badell*, 122 Idaho 442, 443, 835 P.2d 677, 678 (Ct.App.1992) (spouses "executed a Marriage Settlement Agreement . . . in anticipation of the dissolution of their marriage.").

Because agreements made in contemplation of divorce are "marriage settlements" under this Court's case law, they are subject to I.C. § 32–917's requirement that they be in writing and acknowledged.[2]

## 2. The Requirement of a Writing for Agreements Involving Real Property.

■ The settlement agreement reached by Larry and Deborah settled rights in real property, among other things. This Court has clearly stated that agreements settling

---

2. It may be instructive that appellate decisions generally seem to contemplate that agreements made in contemplation of divorce be in writing, signed and acknowledged. *See, e.g., Turner*, 90 Idaho at 312, 410 P.2d at 649 (settlement agreement was signed and witnessed).

real property rights between spouses must be in writing: "Under Idaho's community property system, *any agreement* settling the real property rights of husband and wife entered into prior to or during marriage *must be* in writing, executed and acknowledged in the same manner as conveyances of land." *Keeven v. Wakley,* 110 Idaho 452, 460, 716 P.2d 1224, 1232 (1986) (emphasis added). Therefore, to be enforceable as to real property, the couple's settlement agreement had to be in writing and acknowledged or proved.

### 3. Policy Implications.

Public policy favors requiring divorce settlement agreements to be in writing. One of the major purposes for requiring life-changing documents to be written and executed is to impress upon the parties the importance of the legal consequences of the document. For example, prenuptial agreements and wills must be written, signed, executed, and acknowledged. *See* I.C. § 32–922; I.C. § 15–2–502. Dividing the property of a community that may have lasted for decades has consequences at least as important as distributing the assets of the deceased. Indeed, the process of drafting an agreement often shows the parties that they omitted major issues or made hasty assumptions while negotiating. In addition, the requirement of writing and execution substantiates that the parties actually did come to a meeting of the minds in a vitally important area. This case is a perfect example: Larry left the meeting believing that all issues of the divorce were totally settled. On the other hand, Deborah left the two-hour meeting viewing the dictated agreement as a working proposal subject to revision after verifying the values of the community's assets and debts and thus confirming that the agreement was fair.

It is noteworthy that the dictated agreement itself was never transcribed or reduced to writing.

Requiring a writing will not do violence to dispute resolution. Family mediators routinely reduce agreements to writing. The essence of mediation or negotiation is that the parties themselves come to mutually satisfactory agreements. Oral "agreements" disputed between the parties as soon as they leave the conference room are not mutually satisfactory agreements. In addition, mediators are pledged to neutrality and confidentiality. Recognizing oral agreements could conceivably put mediators in the undesirable situation of being subpoenaed to testify in favor of one party to the mediation.

Finally, requiring a writing will not harm the practice of taking oral stipulations in open court in divorce cases. Stipulations taken by oath are of a different character than self-serving testimony by one spouse, contested by the other spouse, that the parties at a former time reached an oral agreement. Courts accept stipulations as evidence when they are satisfied that the parties currently understand and acknowledge the agreement.

Therefore, for the reasons stated above, we hold that I.C. § 32–917 requires that marriage settlement in contemplation of divorce be in writing to be valid and enforceable.

### B. Neither Party Is Entitled To Attorney Fees On Appeal.

■ Larry requests attorney fees pursuant to I.C. § 12–121. This Court may award attorney fees on appeal pursuant to I.C. § 12–121 in a civil action where it finds the appeal was brought without foundation. *De-Chambeau v. Estate of Smith,* 132 Idaho 568, 572, 976 P.2d 922, 926 (1999); I.C. § 12–121. Deborah's argument that a divorce settlement agreement must be in writing was a non-frivolous interpretation of I.C. § 32–917. Although Deborah attempted to augment the record on appeal before the district court, the district court specifically declined to reach the issue, thus the issue was not preserved. Therefore, attorney fees to Larry under I.C. § 12–121 are not appropriate.

Larry also requests attorney fees pursuant to I.C. § 12–122. Section 12–122 allows for the award of attorney fees in frivolous habeas corpus actions brought by prisoners or jail inmates. This section does not apply to the instant case, a divorce proceeding.

■ Deborah does not support her request for attorney fees with citations to case

law or a statute. A party claiming attorney fees must assert the specific statute, rule, or case authority for its claim. *Samuel v. Hepworth, Nungester & Lezamiz, Inc.*, 134 Idaho 84, 90, 996 P.2d 303, 309 (2000). Because Deborah failed to cite the applicable statutes or case law, she is not entitled to attorney fees. This Court holds that neither party is entitled to attorney fees on appeal.

## IV.

## CONCLUSION

A settlement agreement made in contemplation of divorce is a marriage settlement agreement subject to the requirements of I.C. § 32-917. Neither party is entitled to attorney fees on appeal. Costs to appellants.

Chief Justice TROUT, Justices SILAK, SCHROEDER, and WALTERS concur.

